**Walter CLARKE, Plaintiff,**

v.

**Jennifer Maxwell PARKINSON, f/k/a Jennifer Morris Maxwell Defendant.**

**No. 99 CIV. 2706(VM).**

United States District Court, S.D. New York.

Aug. 23, 2002.

Edward A. Bertele, Andrew L. Indeck, Scarinci & Hollenbeck, Secaucus, NJ, for Plaintiff.

Vincent L. Briccetti, Briccetti, Calhoun & Lawrence, LLP, White Plains, NY, Jennifer Maxwell Parkinson, Bedford, NY, for Defendant.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff, Walter Clarke ("Clarke"), was awarded summary judgment on October 2, 2001 by the Honorable Barrington D. Parker, Jr., then a United States District Judge,[1] on the issue of liability in a contract dispute over a loan agreement dated February 25 and 26, 1991 (the "Loan Agreement") of which Clarke and the defendant, Jennifer Parkinson ("Parkinson"), were parties. See Clarke v. Parkinson, No. 99 Civ. 2706, slip op. (S.D.N.Y. October 2, 2001)(the "Decision"). Following that Decision, the issue of damages was referred to Magistrate Judge Lisa Margaret Smith, who conducted an evidentiary hearing and issued to this Court a Report and Recommendation (the "Report") on June 28, 2002. That Report is attached and incorporated hereto. Parkinson then filed with this Court her objections to the Report, after which Clarke filed his reply. The Court has reviewed the Report, Parkinson's objections, and Clarke's reply and adopts the conclusions of Magistrate Judge Smith in full.

Judge Parker found that the parties entered into a loan Agreement in which Clarke agreed to lend Parkinson (Canadian) $100,000 in consideration for 4.5% of the net recovery of a lawsuit filed in the Federal District Court of California Central District entitled, Susan Maxwell, et al. v. Lester Crown, et al., No. CV 89–6083 and 89–3772 (the "Crown Case"), in which Parkinson was a co-plaintiff. Decision, at 1–2. Applying California law, in accordance with the loan agreement's forum selection clause, (Loan Agreement, at ¶ 9), Judge Parker found that the Loan Agreement between Clarke and Parkinson was unambiguous and integrated and that Parkinson had breached her obligations thereunder. Decision, at 6, 6–7, 10. Damages were contested before Magistrate Judge Smith, whose findings along with Parkinson's applicable objections are addressed below.

The Loan Agreement provides that "Borrower [Parkinson] agrees to repay the Lender [Clarke] a total sum equal to 4.5% of any net recovery obtained by the plaintiffs [in the Crown Case]. Net recovery shall mean all sums received by said plaintiffs, less attorney's fees and unrecovered actual costs incurred in the [Crown] Case." (Loan Agreement, at ¶ 2.) The plaintiffs in the Crown case were awarded $7.5 million pursuant to a settlement agreement (the "Settlement Agreement") with the defendant, Lester Crown. (Report, at 3; Settlement Agreement, at ¶ 4.1.) At issue before Magistrate Judge Smith was what deductions from this amount, if any, are permitted by the Loan Agreement for purposes of calculating Clarke's 4.5% share.

Magistrate Judge Smith concluded that $3,296,019.25 in attorneys' fees and $440,502.80 in unrecovered expenses incurred by the plaintiffs' attorneys in the Crown Case should be deducted from the settlement amount. Neither Clarke nor Parkinson contest these sums.

Parkinson contends that the Loan Agreement's reference to "unrecovered actual costs incurred in the [Crown] Case" also includes personal expenses incurred by the co-plaintiffs such as travel costs for transportation to depositions, hotel fees, telephone bills, postage fees, and the fi-

---

**1.** On October 16, 2001, Judge Parker was commissioned to the United States Court of Appeals for the Second Circuit, and this case thereafter was reassigned to this Court on November 1, 2001.

nancing of attorneys' fees. (Defendant's Objections to Report and Recommendation dated July 17, 2002, at 3–6; Report, at 9–12.) Clarke argues that the Loan Agreement embodies no such intent. The Court agrees with Clarke.

▇ In deciphering the intent of the parties as expressed in the Loan Agreement, the Court begins by construing the language of the agreement itself. *See Warren–Guthrie v. Health Net, Inc.*, 84 Cal.App.4th 804, 101 Cal.Rptr.2d 260, 267 (4th Dist., Div. 2 2000) ("Under standard rules of contract interpretation, the mutual intent of the parties at the time the contract was formed governs its construction. . . . So far as possible, we must infer that intent solely from the written provisions of the contract." (citation omitted; internal quotation marks omitted)); *Farmers Ins. Exch. v. Redempta Yu Knopp, et al.*, 50 Cal.App.4th 1415, 58 Cal.Rptr.2d 331, 334 (4th Dist. Div. 1 1997) ("The fundamental goal of the court is to interpret the contract so as to give effect to the mutual intention of the parties. If possible, the court will determine the mutual intent from the provisions of the contract itself.").[2] The Court notes that the parties' use of the word, "actual," and the proximate phrase, "incurred in the Case," narrows the scope of those "costs" envi-

sioned by their agreement insofar as both serve to anchor such costs to the litigation. In their redundancy, a narrowed interpretation of "costs" reasonably was understood. Additionally, the Court notes the absence of, in particular, the word "expenses," the presence of which would evince a broadened understanding of the "costs" envisioned. Indeed, the agreement lacks reference to personal expenses or financing of any sort. As Judge Parker remarked,[3] "[t]he contact terms at issue are quite clear. The written agreement between Parkinson and Clarke unambiguously set forth the terms governing payment and established the written agreement as an integration. When a contract contains plain wording that enables complete fulfilment of the obligations contained therein, the written 'construction is to be preferred, to the one dependent upon forced addition to or elimination of, terms of the agreement.'" Decision and Order Regarding Defendant's Motion for Reconsideration of Summary Judgment Order, *Clarke v. Parkinson*, No. 99–CV–2706, slip op. at 2 (S.D.N.Y. October 23, 2001) *quoting Nourse v. Kovacevich*, 42 Cal.App.2d 769, 109 P.2d 999, 1001 (1941).

The Court finds additional support for adopting Clarke's narrower interpretation

---

**2.** This case, before the Court on diversity jurisdiction, is governed by the choice-of-law rules of the state in which it sits, here, New York. *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 559 (2nd Cir.2000). "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Id.* Here, the loan agreement clearly expresses an intent by the parties that "[the] agreement shall be interpreted and construed in accordance with the laws of the State of California," (Loan Agreement, at ¶ 9), and the present litigation has sufficient contacts with California in that the *Crown* Case

was filed and litigated through settlement there.

**3.** This quote appears in Judge Parker's discussion of a separate payment dispute resolved in his summary judgment order, namely, whether Parkinson owed Clarke 4.5% of her pro rata recovery as one of several co-plaintiffs in the *Crown* Case or 4.5% of the cumulative recovery of all co-plaintiffs. Judge Parker's resolution of that dispute required him to evaluate, pursuant to California law, the parties' intent as expressed in the Loan Agreement and to address the same key sections relating to the calculation of net recovery. Consequently, his conclusions inform the present analysis.

**348**

over Parkinson's broader one in the definition of "costs" in California law. California Civil Procedure Code § 1032(b) provides that, "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding," and § 1033.5 enumerates the items included by the term, "costs." [4] These items are di-

4. California Civil Procedure Code § 1033.5 provides:

(a) The following items are allowable as costs under Section 1032:
(1) Filing, motion, and jury fees.
(2) Juror food and lodging while they are kept together during trial and after the jury retires for deliberation.
(3) Taking, videotaping, and transcribing necessary depositions including an original and one copy of those taken by the claimant and one copy of depositions taken by the party against whom costs are allowed, and travel expenses to attend depositions.
(4) Service of process by a public officer, registered process server, or other means, as follows:
(A) When service is by a public officer, the recoverable cost is the fee authorized by law at the time of service.
(B) If service is by a process server registered pursuant to Chapter 16 (commencing with Section 22350) of Division 8 of the Business and Professions Code, the recoverable cost is the amount actually incurred in effecting service, including, but not limited to, a stakeout or other means employed in locating the person to be served, unless such charges are successfully challenged by a party to the action.
(C) When service is by publication, the recoverable cost is the sum actually incurred in effecting service.
(D) When service is by a means other than that set forth in subparagraph (A), (B) or (C), the recoverable cost is the lesser of the sum actually incurred, or the amount allowed to a public officer in this state for such service, except that the court may allow the sum actually incurred in effecting service upon application pursuant to paragraph (4) of subdivision (c).
(5) Expenses of attachment including keeper's fees.
(6) Premiums on necessary surety bonds.
(7) Ordinary witness fees pursuant to Section 68093 of the Government Code.
(8) Fees of expert witnesses ordered by the court.

(9) Transcripts of court proceedings ordered by the court.
(10) Attorney fees, when authorized by any of the following:
(A) Contract.
(B) Statute.
(C) Law.
(11) Court reporters fees as established by statute.
(12) Models and blowups of exhibits and photocopies of exhibits may be allowed if they were reasonably helpful to aid the trier of fact.
(13) Any other item that is required to be awarded to the prevailing party pursuant to statute as an incident to prevailing in the action at trial or on appeal.
(b) The following items are not allowable as costs, except when expressly authorized by law:
(1) Fees of experts not ordered by the court.
(2) Investigation expenses in preparing the case for trial.
(3) Postage, telephone, and photocopying charges, except for exhibits.
(4) Costs in investigation of jurors or in preparation for voir dire.
(5) Transcripts of court proceedings not ordered by the court.
(c) Any award of costs shall be subject to the following:
(1) Costs are allowable if incurred, whether or not paid.
(2) Allowable costs shall be reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation.
(3) Allowable costs shall be reasonable in amount.
(4) Items not mentioned in this section and items assessed upon application may be allowed or denied in the court's discretion.
(5) When any statute of this state refers to the award of "costs and attorney's fees," attorney's fees are an item and component of the costs to be awarded and are allowable as costs pursuant to subparagraph (B) of paragraph (10) of subdivision (a). Any claim not based upon the court's established schedule of attorney's fees for actions on a contract shall bear the burden of

rectly linked to a given case or proceeding, reflecting Clarke's proposed interpretation of the term as used in the Loan Agreement. Financing of attorneys' fees and personal expenses of the sort claimed by Parkinson are not in accord with the directness of this list.[5] Indeed, § 1033.5(b) specifically excludes some of Parkinson's asserted costs, including postage and telephone bills.

Accordingly, it is Clarke's interpretation that flows from the plain language of the Loan Agreement. Therefore, Magistrate Judge Smith properly excluded from the sums to be deducted from the settlement amount in the *Crown* Case such personal expenses as air fare, hotel fees, telephone and postage costs, and the financing of attorneys' fees.[6] If Clarke and Parkinson intended otherwise, they easily could have worded their Loan Agreement to say so.

 Magistrate Judge Smith further concluded that the sum of $605,667.82, which related to a Maxwell family debt involving an apartment in New York City, should not be deducted from the settle-

ment amount for purposes of computing Clarke's repayment sum. (Report, at 7–8.) The Settlement Agreement begins by identifying the settlement sum of $7.5 million, which it defines as the "Settlement Payment," (Settlement Agreement, at ¶ 4.1), and then reduces that amount by this $605,667.82 figure. "Plaintiffs *authorize* the Defendants to *subtract such indebtedness* in the aggregate amount of $605,677.82, as of July 1, 1995 *from the Settlement Payment* and to pay the subtracted amount to The Second Venture to extinguish and satisfy the debts of the Maxwell Plaintiffs to that entity." (*Id.,* at ¶ 4.3 (emphasis added).) In return, the defendants in the *Crown* litigation waived all claims surrounding that debt, (*id.,* at ¶ 5.2), thereby granting the Maxwells clear title to the apartment, (Report, at 7). The highlighted language clearly presents the indebtedness figure as distinct from the $7.5 million sum, itself defined in the Settlement Agreement as the "Settlement Payment." (Settlement Agreement, at ¶ 4.1.) The fact that the Settlement Agreement begins by stating the Settle-

proof. Attorney's fees allowable as costs pursuant to subparagraph (B) of paragraph (10) of subdivision (a) may be fixed as follows: (A) upon a noticed motion, (B) at the time a statement of decision is rendered, (C) upon application supported by affidavit made concurrently with a claim for other costs, or (D) upon entry of default judgment. Attorney's fees allowable as costs pursuant to subparagraph (A) or (C) of paragraph (10) of subdivision (a) shall be fixed either upon a noticed motion or upon entry of a default judgment, unless otherwise provided by stipulation of the parties. Attorney's fees awarded pursuant to Section 1717 of the Civil Code are allowable costs under Section 1032 as authorized by subparagraph (A) of paragraph (10) of subdivision (a).

5. The Court notes that § 1033.5(a)(2) defines costs so as to include travel expenses surrounding depositions. Nonetheless, § 1033.5(c)(2) requires that even these expenses "be reasonably necessary to the con-

duct of the litigation rather than merely convenient or beneficial to its preparation," which supports Clarke's narrower reading of the term, "costs," as used in the loan agreement. Further, Parkinson has not addressed the necessity of the travel expenses she asserts.

6. For the reasons stated in the Report, the Court also agrees with Magistrate Judge Smith that, apart from the financing of attorneys' fees, "[e]ven if the individual expenses claimed by defendant were intended to be included as 'costs incurred in the [*Crown*] Case,' the proof of such costs is lacking.... [D]efendant and her sister testified only to estimates and approximations of general categories of expenses. No specific dates, or even ranges of dates, have been provided to establish the relationship of the claimed expenses to the requirements of the litigation ...." (Report at 10–11.) These summary representations are insufficient to satisfy Parkinson's burden of production.

ment Payment of $7.5 million and then indicates that the co-plaintiffs authorize the defendant to deduct the Maxwell family debt evinces an intent that these two figures remain distinct. Accordingly, Magistrate Judge Smith properly concluded that the latter figure was not a reduction of the settlement amount but, rather, an offset for an independent debt.

Finally, the Court notes that while California law provides for a 10% adjustment for prejudgment interest, Cal. Civ. Proc. § 3289, the 7.5% figure appearing in the Report reflects a stipulation by the parties agreeing to that lesser amount, with simple interest to accrue from November 6, 1995 through the date of judgment. (Letter of Plaintiff's Counsel to Magistrate Judge Smith dated January 21, 2002; Letter of Defendant's Counsel to Magistrate Judge Smith dated January 23, 2002.)

For the reasons discussed above, it is hereby

**ORDERED** that the Court adopts the arithmetic appearing on the final page of the Report; and it is further

**ORDERED** that Clarke is entitled to judgment in the amount of $141,356.51 plus simple interest of 7.5% from November 6, 1995 through the date of this Order.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

LISA MARGARET SMITH, District Judge.

By Decision and Order dated October 2, 2001 (hereafter "Decision"), the Honorable Barrington D. Parker, Jr., then a United States District Judge,[1] granted plaintiff Walter Clarke's motion for summary judgment in this matter. Judge Parker found that plaintiff and defendant had entered into a loan agreement in February, 1991. The agreement provided that plaintiff would loan defendant one hundred thousand Canadian dollars, and defendant agreed "to repay to Lender a total sum equal to 4.5% of any net recovery obtained by the plaintiffs, Susan Maxwell, Thomas Schine Maxwell, Jennifer Maxwell Morris,[2] S. Axel Schine, F. Berndt Schine, A. Kevin Schine, W. Lance Schine, J. Mark Schine and A. Vidette Schine, in the civil action entitled *Susan Maxwell, et al. v. Lester Crown, et al.*, Case No. CV 89–6083 JGD (Ex) and 89–3772 JGD (Ex), in the Federal District Court of California, Central District (The 'Case'). Net recovery shall mean all sums received by said plaintiffs, less attorneys' fees and unrecovered actual costs incurred in the Case." Contract between plaintiff and defendant dated February 25 and 26, 1991 (hereafter "the Contract"), at p. 1, ¶ 2. Judge Parker concluded that the loan agreement constituted an unambiguous and integrated contract, and that defendant Parkinson had breached the contract. He further concluded that plaintiff "is entitled to 4.5% of the total net recovery from the *Crown* litigation." Decision at p. 10. The matter was then referred to me for all purposes permitted by law, and specifically for a possibly contested damages hearing. *See* Order of Reference to a Magistrate Judge, docket item # 30. On January 18, 2002, a hearing was held before me on the issue of damages.

[1]. On October 16, 2001, Judge Parker was commissioned a Judge of the United States Court of Appeals for the Second Circuit, and this case was thereafter reassigned to Your Honor on November 1, 2001.

[2]. At the time of the contract, as well as at the time of the originally filed complaint in the *Crown* litigation, defendant went by the name Jennifer Maxwell Morris. In the instant action, and at the time of the hearing, she went by the name Jennifer Maxwell Parkinson.

351

## RELEVANT FACTS

Plaintiff called Jennifer Parkinson, the defendant, to testify at the hearing. Defendant also testified on her own case, and called her sister, Susan Maxwell, to testify. Both sides offered documents in support of their claims. In considering the testimony of the witnesses, I find that they are generally credible, and that there are few disputed issues of fact that are pertinent to this Report and Recommendation.

Pursuant to the Contract[3] between the parties, plaintiff caused a total of $86,542[4] to be wire transferred to defendant and her sister. These funds were obtained in order to pay expenses relating to significant litigation undertaken by defendant and a number of her relatives against an uncle, Lester Crown.[5] The litigation, which was filed in 1989, was settled in 1995. The settlement amount was a total of $7,500,000. *See* Agreement of Settlement and General Release, received as Plaintiff's hearing Exhibit 6a (hereafter "Settlement Agreement"), at p. 4, ¶ 4.1.

The settlement incorporated the *Crown* case, as well as five other cases relating to one or more parties in the *Crown* litigation. *See* Settlement Agreement, at pp. 1–2, ¶ 2.2. The amount of the settlement distributed to defendant was $381,302.75. The amount was determined after deduc-tion of attorneys' fees and unreimbursed costs, as well as a payment of a debt in the amount of $605,667.82 on behalf of defendant and her siblings, Susan Maxwell and Thomas Schine Maxwell, to something called The Second Venture. *See* Settlement Agreement, at pp. 6–7, ¶ 4.3. This debt repayment apparently related to an apartment purchased by defendant with money given or loaned to her by her uncle, and was not related to any claims or counterclaims in the *Crown* lawsuit. Rather, the amount was included as an offset to the total settlement amount in order to further the settlement in the *Crown* litigation. In consequence of the debt repayment, defendant and her siblings also received, as part of the settlement, clear title to the apartment, which they subsequently sold. Defendant asserted that the apartment was sold in 1998, and that her share of the proceeds of the sale of that apartment was approximately $315,000.

During the course of the *Crown* litigation, at least four separate law firms were involved in representing defendant and her co-plaintiffs. The litigation was brought by nine separate plaintiffs; the three Maxwell siblings were responsible for 70% of the costs, based on their shares of their grandfather's company, and their first cousins, the Schines, were responsible for

---

**3.** The Contract itself was provided to plaintiff by defendant, although defendant claims she had no role in preparing it. It apparently was prepared by co-plaintiff Kevin Schine, and was used in connection with one or more similar loans obtained by co-plaintiffs to finance the *Crown* litigation.

**4.** This amount, in whole U.S. dollars, appears to be the equivalent of one hundred thousand Canadian dollars. *See* Wire Transfer Documents, received as Plaintiff's hearing Exhibits 3 and 4.

**5.** Some of the borrowed money was used to repay Susan Maxwell and Thomas Schine Maxwell for money they had already paid for litigation expenses on defendant's behalf. In an affidavit filed with the Court in opposition to plaintiff's motion for summary judgment, defendant asserted that she had borrowed the money to pay the expenses of the *Crown* litigation, and also to pay her own living expenses. *See* Affidavit of Jennifer Maxwell Parkinson, dated June 11, 2001, docket item # 23. During the hearing before me, defendant asserted that the money borrowed from plaintiff was related only to expenses of the *Crown* litigation, and not to her own living expenses. It is not material to this Report and Recommendation whether the specific dollars loaned to defendant actually were used to further the litigation, or were used for personal expenses.

30% of the costs, based on their shares. The case went to trial in September, 1994, and after five weeks a jury verdict in favor of the co-plaintiffs was delivered for $29,000,000. Both sides made post-verdict motions, and the judge ordered a new trial. Thereafter the case was settled, as noted above.

Defendant has few records relating to the expenses undertaken to further the litigation, because part of the settlement agreement required the co-plaintiffs to return litigation-related documents to opposing counsel. *See* Settlement Agreement, at p. 8, ¶ 4.5. Additionally, defendant disposed of certain records, because she wanted no reminder of the litigation. An Accounting produced by counsel at the time of distribution of the settlement funds related only to the period from approximately two years prior to the settlement, and, according to defendant, did not include unreimbursed costs from the first four years that the case was being pursued. *See* Accounting, received as Plaintiff's hearing Exhibit 9 (hereafter "Accounting"). Susan Maxwell believed that the costs assumed by the co-plaintiffs prior to those that appear in the Accounting were approximately $300,000, and that she and her siblings, including defendant, paid over $200,000 of that amount.

A part of the "unrecovered actual costs incurred" claimed by defendant was the cost of borrowing additional money in order to finance the litigation. In September, 1991, the nine co-plaintiffs borrowed $50,000, using an agreement similar to the one in this case, with the understanding that after any recovery in the case, the borrowers would pay a total amount of $100,000 to the lenders. *See* Agreement, received as Defendant's hearing Exhibit I,

at p. 1, ¶ 2. The $100,000 repayment was made following the settlement. Defendant claims that the $50,000 interest paid to those lenders was a part of the litigation expenses. Similarly, in December, 1992, the nine co-plaintiffs borrowed $21,000, also using a similar agreement, with the understanding that repayment would be in the amount of $63,000 following a recovery in the *Crown* litigation. An additional $3,000 was borrowed from that lender, and that lender was then repaid the total amount of $24,000, plus $48,000 in interest. Defendant claims that the $48,000 interest paid to that lender was a part of the litigation expenses.

Defendant also claims that other expenses related to financing and pursuing the litigation, and to personal expenses of the co-plaintiffs connected with the litigation, constitute "unrecovered actual costs incurred." These expenses include the costs of refinancing Susan Maxwell's home and the interest paid for the use of credit cards for cash advances and other costs (estimated at $12,000), parking expenses for Susan Maxwell and Thomas Schine Maxwell over six and one-half years (estimated at $800—$1,000), visits to attorneys, travel and sustenance for a five week trial, trips to New York and Florida to confer with attorneys (estimated total of $4,800), meetings with co-plaintiffs, including meals, to discuss strategy or meet with counsel, preliminary consultation with another lawyer ($1,050), and tax advice from another law firm relating to the settlement ($29,746.26).[6] Susan Maxwell asserted that she and her brother did some research and otherwise assisted in pursuing the case, in order to limit the fees.

Defendant identified her own expenses as including the cost of traveling to Los

---

**6.** It is worth noting that only $6,969.25 of that amount was billed prior to the completion of the settlement in the *Crown* litigation, and the remaining amount was billed between February, 1996, and December, 1997. Ms. Maxwell testified that much of the work was done after the suit was settled.

Angeles between two and six times per year over the six years of the lawsuit, where she had to rent a car and stay in hotels, travel to Florida and to New York, and the cost of a babysitter for her four month old during the trial, at a cost of $50 per day for approximately 30 days. Parking in Los Angeles was $12.50 per day for the days of the trial, as well as for other meetings and mediation efforts. She also used the telephone extensively to discuss the case, and sent many documents via federal express. Defendant estimated these total expenses to be between $10,000 and $15,000.

After the settlement was finalized, and after defendant sold her apartment, she forwarded to plaintiff $28,000, which defendant characterized as being in full and final payment of the debt she owed to plaintiff. She claimed that this reflected 4.5% of her own net recovery from the litigation.[7] Plaintiff agrees that he received the $28,000, and that this amount should be credited to defendant in any calculation of what she owes him under the Contract.

## ANALYSIS

The issue is how the Court should determine the amount of defendant's net recovery in the *Crown* litigation, as defined in the Contract. The sole guidance is contained in the Contract itself: "Net recovery shall mean all sums received by said plaintiffs, less attorneys' fees and unrecovered actual costs incurred in the Case."

The calculation for purposes of damages therefore depends on the definitions of "all sums received by said plaintiffs," "attorneys' fees," and "unrecovered actual costs incurred in the Case."[8]

The Contract is governed by the law of the state of California, which provides little guidance on the determination of damages under the Contract. Rather, the analysis is based on a common sense interpretation of the plain language in the Contract.

I conclude that the starting point for the assessment of damages—"all sums received by said plaintiffs"—is $7,500,000. This sum was the total settlement amount, and any offsets to that amount should be made by reference to the deductions included in the Contract: "attorneys' fees," and "unrecovered actual costs incurred in the Case," which will be addressed *seriatim*.

The first reduction to the full settlement amount in the Accounting (*see* Plaintiff's hearing Exh. 9), an amount of $605,667.82, was by virtue of a Maxwell family debt relating to an apartment in New York City. During the hearing, defendant admitted that the issue of that debt was unrelated to the issues in the *Crown* litigation, and that it became an issue only as an impediment to settlement. The amount of the contested debt—$605,667.82—was deducted from the settlement amount, and the Maxwell siblings then received clear title to the apartment, which was subsequently sold. Whether that apartment was sold for more or less than its value is immaterial, as is the portion of that sale

---

7. I have been unable to perform a calculation which results in a $28,000 figure, based on the information known to me. Defendant received $381,302.75 from the settlement, plus the value of her apartment, which she claimed she sold for a profit to her of $315,000. 4.5% of that total is $31,333.62. The amount forwarded by plaintiff, $28,000, is 4.5% of $622,222.22, which amount could only have been reached if defendant's part of

the proceeds of the sale of the apartment was $240,919.47, or if some other undefined adjustment had been made to the calculation of defendant's net recovery.

8. The Contract also limits the total amount of plaintiff's recovery to defendant's "interest in the net recovery, if any." The Contract at p. 1, ¶ 3. This limitation is not relevant here.

price which benefitted defendant. The debt was unrelated to the *Crown* litigation, and therefore the circumstances of that offset, and the subsequent disposition of the apartment, is immaterial to the issues in this analysis. There is no reason to deduct that unrelated amount from the $7,500,000 received by plaintiffs by virtue the *Crown* litigation.

The first deduction permitted by the Contract from the total settlement amount is for attorneys' fees. This is not a situation where the Court is assessing the propriety of the fees themselves, but rather the Court must determine the amount actually paid by the co-plaintiffs for those fees. Therefore there is no requirement for a thorough and detailed statement of the work done by counsel; a reasonably reliable statement of fees actually paid is sufficient. According to the Accounting produced to the co-plaintiffs along with the settlement distribution, the legal fees paid to counsel at that point were $3,263,000, which included interest on a retainer amount not paid at the outset to the firm of Demetriou, DelGuercio & Lovejoy (hereafter "the Demetriou firm"). Additionally, there was evidence at the hearing that established that co-plaintiffs had paid a $25,000 retainer to the original firm, Augustini, Wheeler & Dorman (hereafter "the Dorman firm"), for initial work on the litigation.[9] At the outset of the litigation co-plaintiffs had also consulted an attorney in Los Angeles, Lester Bronstein, to whom Susan Maxwell paid $1,050. Although she believed that this was one-third of the total amount paid to Mr. Bronstein, for a total of approximately $3,150, the only specific

payments for which testimony was offered was the $1,050 paid by Ms. Maxwell. I therefore conclude that this amount is the only amount established as a legal fee paid to Mr. Bronstein. The co-plaintiffs also sought tax advice from a law firm at the time the settlement was finalized. However, of the total amount of $29,746.26 paid by co-plaintiffs to Valensi, Rose & Magaram for tax advice, only $6,969.25 was for services prior to the effective date of the settlement. Any subsequent tax advice was not "incurred in the Case[,]" but was likely provided to assist the co-plaintiffs in handling their settlement moneys. I conclude that only the smaller amount is for attorneys' fees incurred in the *Crown* litigation. I therefore conclude that the total amount of attorneys' fees which may be deducted from the settlement amount is $3,296,019.25.

The second category of deduction permitted by the Contract is "unrecovered actual costs incurred in the Case." The Contract provides no further definition of this phrase, and I have found no relevant cases with any guidance in California's state or federal courts. I therefore conclude, based on a plain reading of the language of the Contract, that this phrase is intended to encompass costs and expenses directly incurred in prosecuting the *Crown* case. This phrase does not include the cost of financing the litigation, the personal costs incurred by the litigants in pursuing the litigation, or the litigants' expenses in connection with the trial and other proceedings. If it were to include such costs, then a borrower in defendant's position would have an incentive to inflate

9. Included in the Accounting is a payment of $300,000 to the Dorman firm, which apparently referred the matter to the Demetriou firm, and a notation that an additional $200,000 would be "held in trust pending resolution of fee issues." Accounting at p. 2. There were no documents offered at the hearing about those fee issues, and the only reference to them was during the testimony of defendant. Ms. Parkinson said that she did not believe that she had gotten any additional money from that escrowed amount after the settlement distribution, but that she was not sure. I conclude that this amount should be considered as attorneys' fees for purposes of the Contract.

such costs, by staying at expensive hotels, taking more trips than necessary, and eating at expensive restaurants. Thus, not only does the plain meaning of the Contract exclude consideration of such personal expenses, but practical considerations also make it unreasonable to include such personal costs in an assessment of unrecovered actual costs incurred in the litigation.

My conclusion that such costs do not qualify as deductions under the Contract applies to costs of activities undertaken by the litigants to assist the attorneys, even where such assistance was given in order to limit attorneys' fees. The Supreme Court's analysis in *Kay v. Ehrler*, 499 U.S. 432, 435–38, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991), in which the Court concluded that a *pro se* attorney is not entitled to recover attorney's fees for representing himself or herself in an action under 42 U.S.C. § 1988, is applicable here:

> awards of counsel fees to *pro se* litigants … would create a disincentive to employ counsel whenever such a plaintiff considered himself [or herself] competent to litigate on his [or her] own behalf. The statutory policy of furthering the successful prosecution of meritorious claims is better served by a rule that creates an incentive to retain counsel in every such case.

499 U.S. at 438, 111 S.Ct. 1435. Similarly, concluding that personal expenses of litigants who are "assisting" counsel are "costs incurred in the Case" invites those who are intimately involved in the case—and who are likely to be "deprived of the judgment of an independent third party in framing the theory of the case" (499 U.S. at 438, 111 S.Ct. 1435)—to undertake tasks better left to attorneys, paralegals, and investigators. Where an individual litigant elects to undertake legal research, or factual research, or other case-related tasks, even in order to save counsel fees, the litigant should not expect to have the costs of his or her efforts included in any determination of litigation expenses.

Even if the individual expenses claimed by defendant were intended to be included as "costs incurred in the Case," the proof of such costs is lacking. With two exceptions, which I will address below, defendant and her sister testified only to estimates and approximations of general categories of expenses. No specific dates, or even ranges of dates, have been provided to establish the relationship of the claimed expenses to the requirements of the litigation; claims of travel expenses do not relate to particular trips on particular dates or for a particular purpose; claims of hotel expenses, car rentals, and parking costs, are not supported by receipts, or accountings, or dates; claims of mortgages taken and credit cards used are not supported by bills or other documents; claims of telephone bills and use of overnight mail service are not supported in any way, or even identified by approximate date. The information produced is simply insufficient to permit the Court to determine that any given cost was or was not "incurred in the Case," even if such personal expenses were intended to be taken into account in determining the amount due to plaintiff under the Contract. This is not to say that a person in defendant's position would have had to produce an itemized and detailed account of each and every penny spent, in the way that a law firm would be required to do in order to establish fees and costs; nevertheless, something more than has been produced here would be necessary in order for the Court to reach any conclusion about the propriety of including such expenses in any calculation under the Contract. Defendant was aware of this Contract after it was signed, during the pendency of the *Crown* litigation, during the time of her acceptance of the settlement terms, and thereafter, and she elect-

ed not to maintain any account of "actual costs incurred in the Case" during that entire period of time. She should not now benefit from her own laxity in this regard.

The two items for which specific amounts and approximate dates are established are the interest payments made to lenders who assisted the co-plaintiffs with litigation expenses, and who then were repaid after the settlement was distributed. The amounts of interest—$50,000 and $48,000—are clear and undisputed. Although only limited documentary proof has been offered to establish that the interest was actually paid, I accept the testimony that such payments were ultimately made. Part of plaintiff's argument is that there is no proof that the borrowed money actually went to support the litigation, and therefore the interest amount should not be considered a litigation expense. I conclude, however, that as the agreement in each of those cases directly referenced the *Crown* litigation, and the repayments were made only after the settlement, that it is reasonable to conclude that these moneys were used to support the litigation. However, I cannot conclude that these amounts should qualify as "unrecovered actual costs incurred in the Case." If these exorbitant interest amounts were to be deemed litigation expenses, and therefore deductible under the Contract, then a borrower would have an incentive to borrow even more money, even borrowing it from a personal business or a relative, in order to reduce the money actually owing to the lender at the conclusion of the litigation.[10] Such a result would invite imposition of artificially high interest rates, and would encourage litigants to borrow against future potential recovery, neither of which is a result the Court should encourage. I therefore con-

clude that the interest payments on loans similar to the one at issue in this case do not qualify as "costs incurred in the Case."

The Accounting produced to the *Crown* co-plaintiffs when the settlement was finalized includes total costs ($340,502.80) advanced by the various law firms. There is no reason to conclude that these costs are not directly related to the litigation, and therefore this deduction will be allowed. Additionally, Susan Maxwell has expressly testified that a payment of $100,000 was made to the Demetriou firm on September 20, 1989, as an advance on expenses. Although she testified about other advances, which she believed were approximately $300,000 in total, those expenses were not expressly established, either by date or amount. I conclude, therefore, that an additional $100,000 in litigation costs should be allowed as a deduction. The remaining amounts of payments, apparently made periodically, are not identified by specific amount or specific date, and therefore there is insufficient proof to permit them to be deducted from the net recovery.

Finally, prejudgment interest must be added, at a rate of 7.5%, calculated on a simple interest basis from November 6, 1995. *See* letter of Andrew L. Indeck dated January 21, 2002, letter of Vincent L. Briccetti, dated January 23, 2002, docket items # 39 and 40.

Based on this analysis, the following calculation leads to the net recovery, under the Contract:

| | |
|---|---|
| $ 7,500,000.00 | settlement |
| − 3,296,019.25 | attorneys' fees |
| − 440,502.80 | unrecovered actual costs incurred in the Case |
| $ 3,763,477.95 | net recovery |
| x .045 | (4.5% of the net recovery) |
| $ 169,356.51 | |
| − 28,000.00 | already paid |
| $ 141,356.51 | amount due and owing |
| + simple interest of 7.5% from November 6, 1995 | |

---

**10.** Such an analysis might also require that the amount to be paid to this plaintiff would have to be deducted before determining how

much is owed to this plaintiff—clearly a cumbersome and unmanageable result not anticipated by the signators to the Contract.

## CONCLUSION

For the reasons set forth herein, I respectfully report and recommend that plaintiff shall have judgment against defendant in the amount of $141,356.51, plus simple interest of 7.5% from November 6, 1995, to the date of judgment.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed.R.Civ.P. 72(b), the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Fed. R.Civ.P. 6(e), or a total of thirteen (13) working days (*see* Fed.R.Civ.P. 6(a)), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Victor Marrero, at the United States District Court, Southern District of New York, United States Courthouse, 40 Centre Street, New York, New York 10007, and to the chambers of the undersigned at the United States District Court, Southern District of New York, United States Courthouse, 300 Quarropas Street, White Plains, N.Y. 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Marrero.

June 28, 2002.